**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SUNOCO PARTNERS MARKETING &** | ) | |
| **TERMINALS L.P.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 15 C 8178** |
| | ) | |
| **U.S. VENTURE, INC., U.S. OIL CO., INC.,** | ) | **Judge Rebecca R. Pallmeyer** |
| **AND TECHNICS, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Gasoline producers and distributors blend butane into gasoline before it is sold. Butane increases the volatility of gasoline, and gas must have sufficient volatility in order for vehicles to start in colder temperatures. Because butane contributes to air pollution in warmer temperatures, however, government regulations limit the amount of butane that can be used in warmer weather. Those limits vary from season to season and from state to state. Butane is cheaper than gas, and gasoline distributors maximize their profits by blending the greatest legally-allowable amount of butane into the gasoline they sell. The varying legal limits complicate this effort: blending butane at the early stages of the production process, such as at the refinery or in the pipeline, requires the producer to create a blend that complies with the lowest limits in any of the several states to which the resulting blend will then be sent.

Plaintiff Sunoco Partners Marketing & Terminals ("Sunoco") is the holder of several patents that describe a system and method for blending butane with the gasoline at a point close to the end of the distribution process: immediately before being distributed to the tanker trucks that take gasoline to consumer gas stations. The patented method enables the producer to blend the maximum allowable butane into each batch based on where the truck is going and what month it is. In this lawsuit, Sunoco alleges that U.S. Venture, Inc., and U.S. Oil, Inc. as its

wholly owned subsidiary or division, are operating a system that infringes three of Sunoco's patents.[1] Five claim terms are contested. The court's construction of those terms follows.

**BACKGROUND**

**A.     The patented invention**

Gasoline producers and distributors blend butane into gasoline to increase its volatility, allowing cars to start in colder temperatures, and reducing per-gallon costs. (U.S. Patent No. 6,679,302 col. 1 ll. 44–51 (filed Feb. 8, 2002).) Because butane is a major component of volatile organic compounds ("VOCs") in the atmosphere, the U.S. Environmental Protection Agency (EPA) regulates the amount of butane that can be blended with gasoline. (*Id.* at col. 1 ll. 52–56.) The regulations are not uniform across the nation; the regulations are in force between May and September of each year, with each state (and parts of certain states) assigned a maximum butane limit depending on the climate. 40 C.F.R. § 80.27. The EPA sets the limit as a measurement of volatility known as the Reid Vapor Pressure ("RVP"), expressed in pounds per square inch. *See* 40 C.F.R. § 80.27(a)(1). For instance, the allowable RVP limit in July of each year is 9.0 pounds per square inch in Illinois, but just 7.8 pounds per square inch in Georgia. 40 C.F.R. § 80.27(a)(2)(ii). Each time that butane is blended with gas during May through September, the EPA requires that the mixture be certified to ensure that it complies with the regulations. ('302 Patent col. 1 ll. 61–64.)

Gasoline distribution typically begins at a refinery, where crude oil is refined into gasoline. From there, the gasoline moves through a pipeline to a "tank farm" or terminal—that is, a facility with a number of large storage tanks for holding gasoline or other petroleum products. (*See* '302 Patent col. 1 ll. 66–col. 2 ll. 1; Def.'s Opening Claim Construction Br. [hereinafter Venture Br.] [86], at 3–4; Joint LPR 4.2(f) Claim Construction Chart & Status Report

---

[1]     Also named as a Defendant in the original complaint was Technics, Inc., a Naperville-based corporation from whom U.S. Venture and U.S. Oil purchased the system, but Plaintiff has settled its claims against Technics.

[116], at 6.)  From the tank farm, individual transport trucks pick up the gasoline from a dispensing unit, called a "rack," and deliver it to consumer gas stations.  (Venture Br. 4.)

Blending can occur at any point in this distribution chain, but when producers blend gasoline at refineries and in pipelines that serve several regions with varying RVP limits, the producers can add only the amount of butane permissible in the region with the strictest butane regulations.  ('302 Patent col. 2 ll. 6–10, 27–30.)  Further complicating the process, a producer who blends gasoline in pipelines must breach the pipeline in at least two locations to sample the gasoline and to add butane, generating a risk of spills.  (*See id.* at col. 2 ll. 18–23.)  Therefore, blending at a tank farm presents an opportunity to safely blend butane at a location that serves the smallest region in the distribution chain before individual gas stations.  (*See id.* at col. 2 ll. 27–33.)

Blending at tank farms is not without its obstacles, however.  Before butane is added to the gasoline in a large tank, the contents of the tank must be stirred to homogenize the gasoline, and RVP measurements must be taken from multiple areas of the tank to ensure that the gas is completely mixed.  (*Id.* at col. 2 ll. 40–44.)  Once the initial RVP has been accurately measured, butane can be added to achieve the desired RVP.  (*See id.* at col. 2 ll. 24–27.)  Thereafter, every time that unblended gasoline is added to the tank, the RVP must be re-measured, a labor-intensive and imprecise process.  (*Id.* at col. 2 ll. 35-37, 40–41.)

The three patents at issue cover several variations of an invention that allows butane to be accurately blended into gasoline near the end of the distribution process.  All were patented by Larry Mattingly and Steven Vanderbur, who assigned the patents to MCE Blending, LLC, which in turn assigned them to a Sunoco affiliate.  (Compl. ¶¶ 16–17, 29–30, 42–43.)  Patent 6,679,302, issued in 2004, is an invention that allows producers to blend butane with gasoline "at the tank farm, immediately before the gasoline is dispensed to a tanker truck."  ('302 Patent col. 3 ll. 15–16.)  The blending process occurs after the gasoline moves out of the tank, on its way to the rack.  (*Id.* at col. 3 ll. 16–21.)  Patent 7,032,629, issued in 2008, is a continuation of

the '302 Patent and claims priority over it. (U.S. Patent No. 7,032,629 col. 1 ll. 11–15 (filed Jan. 16, 2004).) The '629 Patent shares substantially the same specification as the '302 Patent, but is not explicitly limited to performing the blending process at tank farms. (*See id.* at col. 13 ll. 12–19.) Finally, Patent 7,631,671, issued in 2009, adapts the technology to blend butane into a gasoline stream at any point along a petroleum pipeline. (U.S. Patent No. 7,631,671 col. 1 ll. 16–19 (filed Apr. 20, 2006).)

The patents include an exemplary embodiment of the '302 and '629 patents; though the court found it somewhat opaque, it is reproduced below ('302 Patent fig. 2; '629 Patent fig. 2). In this embodiment at a tank farm, a gasoline supply 115 and a butane supply 110 are blended together on demand by an analyzing and blending unit 120. ('302 Patent col. 10 l. 60–col. 11 l. 3.) When a tanker truck arrives at the tank farm, the operator selects the desired grade of gasoline, which initiates the blending process. ('302 Patent col. 11 ll. 4–7.) The analyzer 250 measures the vapor pressure of a sample of butane pulled from the butane outlet line 220 and a sample of gas from the gasoline outlet line 260. (*Id.* at col. 11 ll. 7–12.) The analyzer sends the measurement data to the processor 265, which calculates the maximum amount of butane that can be blended into the gasoline. (*Id.* at col. 11 ll. 30–33.) The processor then instructs the injector 275, via a programmable logical controller 270, to insert the calculated amount of butane into the gasoline line 260. (*Id.* at col. 11 ll. 33–36.) The blended gasoline then flows to the transport 125. (*Id.* at col. 11 ll. 36–38.)



**FIG 2**

Though the '671 patent does not have a schematic embodiment, the summary of invention describes an adaptation of the same technology to blend butane in a pipeline:

> Therefore, in one embodiment the invention provides a system for in-line blending of gasoline and butane comprising (a) a gasoline stream; (b) a butane stream; (c) a blending unit for blending said gasoline stream and said butane stream at an actual blend ratio and an actual blend rate to yield a blended gasoline stream; (d) an upstream vapor pressure sensor in sensory communication with said gasoline stream downstream of said blending unit; (e) a downstream vapor pressure sensor in sensory communication with said gasoline stream downstream of said blending unit; and (f) one or more information

processing units (IPUs) in informational communication with said upstream vapor pressure sensors, logically programmed to calculate a calculated blend ratio based upon the vapor pressure of said gasoline stream, and for communicating said calculated blend ratio to said blending unit; wherein said blending unit periodically receives said calculated blend ratio from said IPU, and adjusts the actual blend ratio to coincide with said calculated blend ratio.

('671 Patent col. 3 ll. 24–41.)

The '302 patent contains 41 claims, the '629 patent contains 33, and the '671 patent contains 54. The meaning of the following terms are disputed by the parties as they appear in the various claims, often across all three patents.

## B.    Disputed claim terms

The parties dispute several claim terms, divided into roughly five categories. First, the term "in fluid connection," which is used in the '302 and '629 patents in phrases such as this: "a blending unit, at the tank farm, downstream of and **in fluid connection** with the tank of gasoline and the tank of butane" and "a dispensing unit downstream of and **in fluid connection** with the blending unit." (*See, e.g.*, '302 Patent col. 13 ll. 12–23.) They also dispute the term "dispensing the blend," used in the patents' description of a method describing various steps, including "**dispensing the blend** to gasoline transport vehicles using a dispensing unit located at a rack." (*See id.* at col. 14 ll. 3–11.)

Second, the meaning of "a vapor pressure," as it appears in all three patents in contexts such as: "The method of claim 13, wherein the blend ratio is determined from **a vapor pressure** of the gasoline stream and **a vapor pressure** of the butane stream" ('302 Patent col. 14 ll. 17–19) and "providing a butane stream that comprises **a butane vapor pressure.**" ('671 Patent col. 15 l. 56–col. 16 l. 7.)

Third, the term "operable," used in the '302 and '629 patents in statements like: "a gasoline vapor pressure sensor **operable** for measuring the vapor pressure of gasoline upstream of the blending unit" (*see* '302 Patent col. 13 ll. 31–41), and "[t]he system of claim 3 further comprising a process control unit **operable** for receiving the measured gasoline vapor pressure from the gasoline vapor pressure sensor . . ." (*See* '629 Patent col. 13 ll. 30–39.)

Fourth, the term "blending unit," used in all three patents' claims, for instance: "a gasoline vapor pressure sensor operable for measuring the vapor pressure of gasoline upstream of the **blending unit**" (*see* '302 Patent col. 13 ll. 31–41), "[t]he system of claim 1, wherein the **blending unit** comprises one or more valves for regulating the ratio of butane and gasoline blended by the **blending unit**" (*see id.* at col. 13 ll. 61–63), and "blending said butane stream and said gasoline stream at a **blending unit** at said blend ratio to provide a blended gasoline stream having a blended vapor pressure less than or equal to said allowable vapor pressure." (*See* '671 Patent col. 15 l. 56–col. 16 l. 7.)

Fifth, the words "upstream" and "downstream" as they appear in all three patents: "a gasoline vapor pressure sensor operable for measuring the vapor pressure of gasoline **upstream** of the blending unit" (*see* '302 Patent col. 13 ll. 31–41), and "a blending unit **downstream** of and in fluid connection with the tank of gasoline and the tank of butane." ('629 Patent col. 13 ll. 12–19.)

## C. Prosecution history

The inventors filed the first patent application of the family, the '302 Patent, on February 8, 2002. ('302 Patent at [22]). The two following patents were filed successively. Shortly before the '302 Patent issued on January 20, 2004 (*id.* at [45]), the inventors filed the '629 Patent application on January 16, 2004 ('629 Patent at [22]), which the Patent and Trademark Office ("PTO") issued a little more than two years later on April 25, 2006 (*id.* at [45]). The inventors then filed the '671 Patent application on April 20, 2006 ('671 Patent at [22]), just before the '629 Patent was formally issued. The PTO issued the '671 Patent on December 15, 2009. (*Id.* at [45].)

The portion of the prosecution history relevant to the disputed terms is a comment by the patent examiner, in allowing the '629 Patent application (which claims priority over the '302 Patent), noting that none of the prior art "alone or in combination, teach Applicant's invention of a method and apparatus for blending and dispensing such blended gasoline at ***a rack*** (*i.e.*

*essential subject matter back in the allowance of the parent application*).  (Steven Douglas, May 20, 2005 Office Action, Joint App'x to Claim Constr. Brs. [hereinafter Joint App'x] [81-3], at A414–15 (both emphases in original).)

## D.   The instant lawsuit

Sunoco alleges that Technics, Inc. sold butane blending systems, which infringe on Sunoco's patents, to gas and liquid processing facilities, including U.S. Venture.  (Compl. ¶ 13.) Sunoco further asserts that U.S. Venture has been operating such a system in several locations.  (Compl. ¶ 14.)  Sunoco's complaint, filed September 17, 2015, alleges three counts of infringement, one for each patent.  (*See generally* Compl.)  Technics was dismissed with prejudice as a defendant in June 2016.  (Order, Jun. 23, 2016 [65]; *see also* Joint Mot. for Dismissal with Prejudice [60]).  U.S. Venture and U.S. Oil (collectively, "Venture")[2] deny that the blending systems they operate infringe on Sunoco's patents (Defs. U.S. Venture, Inc.'s & U.S. Oil's Am. Answer, Affirmative Defenses, & Am. Countercls. [hereinafter Am. Answer] [78], at 16–17) ("Answer to Prayer for Relief"), and further assert counterclaims for a declaratory judgment of non-infringement, invalidity or unenforceability of the patents.  (*Id.* at 20, ¶ 1.)

## DISCUSSION

## A.   Legal standard

The claims of a patent define the scope within which the patentee has the exclusive right to the invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).  Where the meaning of claim language is disputed, construction of those claims is a matter of law for the court to determine.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996).  Courts begin by looking to the ordinary and customary meaning of a claim term to "a person of ordinary skill in the art in question" at the date of the patent filing.  *Phillips*, 415 F.3d at 1313.  In some cases, the court's claim construction "involves little more than the application of the widely

---

[2]    U.S. Oil is a division of U.S. Venture, and they are jointly represented in this suit. (*See* Defs. U.S. Venture, Inc.'s & U.S. Oil's Am. Answer, Affirmative Defenses, & Am. Countercls. [67], at 3, ¶ 7.)

accepted meaning of commonly understood words," for which dictionaries may be informative. *Id.* at 1314.

Terms are interpreted in the context of the claim in which they appear, and in relation to the other claims of the patent. *See id.* Claim terms are typically used consistently between claims, *id.*, and where "different words or phrases are used in separate claims, a difference in meaning is presumed." *Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005). This presumption can be overcome where the specification indicates that the different terms are intended to cover the same subject matter. *Id.* Claims can also explicitly relate to one another: a limitation in a dependent claim "gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1314–15.

The specification is also "always highly relevant to the claim construction analysis." *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). A term may be defined by the specification in a way that diverges from the ordinary meaning of a term, and in that situation, "the inventor's lexicography governs." *Id.* at 1316. Similarly, an inventor can intentionally limit a claim's scope in the specification. *Id.* Ordinarily, a preferred embodiment does not limit the scope of the patent, but where "a patentee's consistent reference to a certain limitation or a preferred embodiment as 'this invention' or the 'present invention,'" it may limit the scope of the invention, "particularly where no other intrinsic evidence suggests otherwise." *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136 (Fed. Cir. 2011); *see also Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013). If the specification is "not uniform, or where other portions of the intrinsic evidence do not support applying the limitation to the entire patent," however, the limitation should not be applied to the claims. *Absolute Software*, 659 F.3d at 1136. Furthermore, even where the specification details specific embodiments of the invention, the Federal Circuit has "repeatedly warned against confining the claims to those embodiments." *Phillips*, 415 F.3d at 1323.

Courts may also consider the prosecution history because it provides evidence of how the Patent and Trademark Office and the inventor understood the patent. *Id.* at 1317. Prosecution history is particularly useful where "the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

## B.  Construction of terms

### 1.  "In fluid connection" / "dispensing the blend"

The parties have devoted substantial attention to the contested terms "in fluid connection" and "dispensing the blend." Venture proposes a construction of the two terms that introduces an element of temporal immediacy, based on a limitation that Venture derives from the specification. Sunoco argues for "a plain and ordinary meaning" construction. The parties propose the following:

| Claim term | Sunoco's proposal | U.S. Venture's proposal |
|---|---|---|
| "in fluid connection"<br><br>(claims 1, 10 and 36 of the '302 patent; claims 1 and 10 of the '629 patent) | *plain and ordinary meaning*,[3] or alternatively, "the elements are arranged such that fluid can flow from one element to another element" | "the elements are arranged such that fluid flows immediately from the first element to the second element" |
| "dispensing the blend"<br><br>(claims 12 and 39 of the '302 patent; claim 13 of the '629 patent | *plain and ordinary meaning*, or alternatively, "distributing the blended gasoline and butane" | "the blended stream is immediately dispensed to gasoline transport vehicles" |

### a.  The language of the claims

First, Venture finds the language of the claims impose an immediacy requirement. As the court reads that language, however, it does not appear to require immediacy. Relevant language from the '302 patent claims:

    1.      A system for blending gasoline and butane at a tank farm comprising:
        a)      a tank of gasoline;
        b)      a tank of butane;

---

[3]     Where a party proposes the plain and ordinary meaning, the court has interpreted the request to mean that the court should not construe the term because the term has a "widely accepted meaning of [a] commonly understood word[]." *Phillips*, 415 F.3d at 1314.

       c)      a blending unit, at the tank farm, downstream of and **in fluid connection** with the tank of gasoline and the tank of butane;

       d)      a dispensing unit downstream of and **in fluid connection** with the blending unit; and

       e)      a rack, wherein the dispensing unit is located at the rack and is adapted to dispense gasoline to gasoline transport vehicles.

('302 Patent col. 13 ll. 12–23.)  Reading this language in the context of the claim, the court sees no indication that fluid must pass immediately between the elements that are "in fluid connection."  Venture insists that the term must mean that fluid is constantly flowing through the "fluid connection," or the term "fluid" would be meaningless.  (Venture Br. 17.)  But a fluid connection could just as easily mean that the elements are connected by a means that merely allows fluid to flow between them, such as a pipe with valves.  Therefore, the language of the claim itself does not resolve the dispute.

The term "dispensing the blend," in its commonly understood meaning, similarly provides no information about when or how quickly it occurs.  Nor does the context of this claim language imply a temporal requirement:

    12.     A method for blending gasoline and butane at a tank farm comprising:
       a)      drawing a gasoline stream from a tank of gasoline;
       b)      drawing a butane stream from a tank of butane;
       c)      blending the butane and gasoline streams, at the tank farm, to form a blend; and
       d)      **dispensing the blend** to gasoline transport vehicles using a dispensing unit located at a rack.

('302 Patent col. 14 ll. 3–11.)  Finding little guidance in the claim language alone, the court moves to consider the specification.

### b. The language of the specification

Venture argues that the meaning of both "dispensing the blend" and "in fluid connection" must be limited by language in the specification stating that the blended gasoline is "immediately" distributed to the tanker trucks.  Venture finds this proposed limitation first in the summary of the invention in both the '302 and '629 patents:

The present invention is a system and method for blending butane with gasoline at the tank farm, immediately before the gasoline is dispensed to a tanker truck.

11

('302 Patent col. 3 ll. 14–16; '629 Patent col. 3 ll. 21–23.)   The sentence appears in almost identical form in the abstract of both patents:

> A system and method is provided for blending butane with gasoline at petroleum tank farms, immediately before distribution to tanker trucks.

('302 Patent at [57]; '629 Patent at [57].)  According to Venture, the word "immediately," as used in the summary and abstract, demands that both contested claim terms refer to the timing of movement of gasoline or blended product.

The word "immediately" has two commonly-understood definitions, however:

> 1:        in direct connection or relation: DIRECTLY <the parties immediately involved in the case> <the house immediately beyond this one>
> 2:        without interval of time: STRAIGHTAWAY <I'll make that call immediately>

*Immediately,* MERRIAM-WEBSTER COLLEGIATE DICTIONARY (11th ed. 2003).  When read in the context of the specification, the term does not appear to refer to the second definition—without interval of time—but instead to location of this system in the larger process of gasoline production and distribution; that is, directly before distribution.  The sentence that follows the use of the "immediately" in the summary of the invention confirms this reading, as it describes the order of process as follows:

> The blending occurs downstream of the gasoline and butane storage tanks on the tank farm, after the gasoline and butane are drawn from their storage tanks for dispensing into a tanker truck, but before the gasoline is actually dispensed to the tanker truck at the rack.

('302 Patent col. 3 ll. 16–21; '629 Patent col. 3 ll. 23–28.)  The specification describes the order of process; it makes makes no mention of the lapse in time.

Only when read in this way are the summaries of invention and abstracts consistent with the primary purpose of the patented invention: that it allows the user to blend just before distribution to tanker trucks, rather than at a refinery, in a pipeline, or by blending a full tank at the tank farm.  Much of the "background of invention" section is devoted to disparaging the prior art of blending earlier in the gasoline production process.  ('302 Patent col. 1 l. 65–col. 2 l. 52;

'629 Patent col. 2 ll. 4–58). The specification further identifies the benefits of blending gasoline and butane immediately before distribution:

> By blending gasoline and butane immediately before the gasoline is dispensed to a tanker truck, and by continuously controlling the ratio of gasoline and butane blended by the blending apparatus, a number of significant advantages are attained, including the following:
> 1. The amount of butane blended with the gasoline can be more thoroughly controlled, yielding less RVP variability among tanker truck shipments.
> 2. The butane and gasoline can be blended to yield consistent optimal performance of motor vehicles that employ the blended gasoline, regardless of the time of year in which the motor vehicle is operated, or the temperature or elevation at which such motor vehicle is operated.
> 3. The ratio of butane and gasoline blended can be easily varied and controlled to comply with regional and/or seasonal RVP requirements imposed by EPA or state regulations upon the sale of retail gasoline.
> 4. By continuously adding butane to gasoline dispensed to tanker trucks, and by continuously blending at the maximum RVP and vapor/liquid ratio allowable by law, tank farm operators are able to maximize the amounts of butane that they blend with gasoline, and minimize their cost basis for the gasoline sold.

('302 Patent col. 3 ll. 44–67; '629 Patent col. 3 l. 51–col. 4 l. 6.) All of these advantages are derived from precisely controlling the blending process and performing it immediately before distribution, not from eliminating any lapse in time between blending and filling a truck with the blend. While it is true that some of these advantages could be undermined by a delay that is truly substantial—for example, holding the blend from August to September when a new allowable RVP goes into effect—the advantages of the patented process do not require that the gasoline be immediately dispensed with *no* delay at all. Instead, the advantages are obtained by blending before dispensing to the tanker trucks and *no earlier* in the larger gasoline production and distribution process.

Venture is correct, of course, in arguing that a limitation that uniformly appears in the specification can limit a claim. In *C.R. Bard, Inc. v. United States Surgical Corp.*, the court considered a patented device to repair hernias in the form of a plug. 388 F.3d 858, 859–60 (Fed. Cir. 2004). The claim in question described the plug only as "conformable" and "extremely pliable." *Id.* at 860. The specification, however, uniformly described the plug as having pleats: the summary of invention described "the present invention" as "includes a pleated surface," the

abstract described the plug as having a pleated surface, and the preferred embodiments all referred to a pleated plug. *Id.* at 860–61. The district court accordingly construed the claim to mean that the plug contained pre-formed pleats, *id.* at 861, and the Federal Circuit affirmed, *id.* at 866.

Unlike "pleats," however, the meaning of the word "immediately" in the instant claim is susceptible to two different interpretations, only one of which is supported by the purpose of the patent as described by the specification. Venture raises other cases where, like *C.R. Bard*, a clear limitation was imported from the specification to a claim. *See Honeywell Int'l, Inc. v. ITT Indus. Inc.*, 452 F.3d 1312, 1318–19 (Fed. Cir. 2006) (term "fuel injection system component" limited to a fuel filter); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340–43 (Fed. Cir. 2001) ("catheters" limited by specification to catheters with coaxial lumens, not dual lumens). More recently, Venture called the court's attention to *Medicines Company v. Mylan, Inc.* where the Federal Circuit reversed the district court's refusal to find that the specification's consistent reference to an "efficiently-mixed" solution limited the claims to such a solution, because, the Circuit found, "apart from efficient mixing, no part of the patents' disclosure teaches another method capable of [achieving the claim's purpose]." Nos. 2015-1113, 2015-1151 & 2015-1181, ___ F.3d ___, 2017 WL 1279335, at *1, 6 (Fed. Cir. Apr. 6, 2017). Unlike the patents at issue in those cases, the specification here does not dictate the limitation that Venture proposes. Instead, "immediately before" when read in the context of the specification takes on its definition in terms of process, not in terms of time.

Venture points out that the embodiments in the patents at issue describe an invention that distributes the blended gasoline on demand to a tanker truck at the rack. Venture also emphasizes the patent examiner's comment that prior art was distinguished by the current invention's ability to dispense the blend at a rack. (Venture Br. 11–14 & n.5.) The fact that there are no embodiments that explicitly contemplate a delay before the blend is distributed, however, does not conflict with the order-of-process interpretation of "immediately" that is

otherwise best supported by the specification. The exemplary embodiments of the invention, which provide blended gasoline on demand to the tanker truck, may be the ideal version of this invention, but they do not establish the limitation Venture proposes, and nothing in the specification as a whole rules out the possibility of pause or delay in distributing the blended gasoline. Absent a consistent instruction from the specification, the court will heed the *Phillips* court's warning against "confining the claims to [] embodiments." 415 F.3d at 1323.

*Regents of the University of Minnesota*, also raised by Venture, was an even clearer case: a limitation that appeared on the face of the claim was unequivocally supported by the specification. The patents at issue in *Regents* described "septal occluders," medical devices used to block holes between chambers of the heart. 717 F.3d at 932. The claim to be construed described a septal occluder "with two occluding disks 'affixed' to one another at their centers, to 'define a conjoint disk' . . . ." *Id.* at 934. The parties disputed whether this meant that the claim described only an occluder containing two disks joined in the middle, or could also cover a single piece. *Id.* at 935. The district court concluded that the claim reached only an occluder containing two disks. *Id.* Affirming that construction, the Federal Circuit noted that the plain language of the claim described two disks "affixed" to one another and observed that a single object cannot be "affixed" to itself. *Id.* The specification further described "the present invention" as "first and second occluding disks which are attached to one another." *Id.* at 936. Every single embodiment was in accord with this description contemplating two disks. *Id.* In the patents at issue in this case, in contrast, the claim does not itself lay out the limitation that the transfer to the trucks occur without delay, nor is the specification consistent on that limitation. *See Absolute Software*, 659 F.3d at 1136 (only "consistent" limitation in specification can limit claims).

Venture also notes that the inventor testimony largely describes the same embodiments as the invention, in which mixing occurs on the way to the rack. Vanderbur's testimony suggests only that blending gasoline on the way to the rack is the preferred embodiment of this

invention, and presents the largest improvement over blending a full tank of unblended gasoline. (Vanderbur Dep., Ex. 1 to Dodd. Decl. [86-2], at 262:4–263:1 (assuming that invention is blending "on route" to rack).) In Mattingly's testimony, he does not define the invention solely by the fact that the blending occurs on the way to the rack, but notes that the blend can be precisely controlled regardless of where the batch is headed. (Mattingly Dep., Ex. 2 to Dodd. Decl. [86-3], at 28:6–9 ("[Process blending is n]ot necessarily just to the loading rack, but you're blending – process blending is that you're controlling everything with a [processor].").) Again, though the preferred embodiment of the invention might be blending on the way to the rack, Vanderbur and Mattingly's testimony does not limit the invention only to those embodiments.

No part of the specification refers to the virtues of blending the gasoline and dispensing it *without delay* to the tanker trucks. Instead, the specification discusses the benefits of blending the gasoline before distribution to the tanker trucks, and no earlier in the larger production and distribution process of gasoline. Accordingly, the court does not find that the use of "immediately" in the specification should serve as a temporal limitation on the claims.

### c. The meaning of "in fluid connection"

That interpretation does not wholly resolve the meaning of "in fluid connection." Venture again proposes a definition that requires importation of an "immediately" limitation: "the blended stream is immediately dispensed to gasoline transport vehicles." Again, the court declines to adopt that limitation, which does not appear in the claim terms. Sunoco's proposal—that fluid *can* flow between the elements but need not always—is supported by the specification. First, the schematic embodiment shows several valves between the blending unit and the dispensing unit, shaded in the diagram below:



('302 Patent fig. 2; '629 Patent fig. 2.)  If the blending unit were in constant fluid connection with the dispensing unit, there would be no need for the valves.  Venture responds to this argument by asserting that "logically, those valves are *always* open during blending because otherwise the blended gas would have nowhere to go."  (Def.'s U.S. Venture Inc.'s & U.S. Oil's Claim Constr. Reply Br. [hereinafter Venture Reply Br.] [107], at 6 (emphasis in original).)  This assumption is not supported by the embodiment.  The schematic shows it is possible for the valves to the dispensing unit to be shut for a brief pause—to change trucks at the rack, for instance, as suggested by Sunoco—while the blending unit continues blending until the pipes filled up.  It also appears that only one line is open at a time, depending on the type of gasoline selected by the transport operator.  In sum, the inclusion of the valves in the schematic means that the valves can be closed, which defeats Venture's proposal of an unrestricted connection and supports Sunoco's construction.

Second, the term "in fluid connection" also appears in part of the specification describing the connection of a bypass line: "[t]he butane supply 110 may further comprise a bypass line 245 in fluid connection with the butane tank 205 and the outlet line 220."  ('302 Patent col. 10 ll. 61–63.)  The purpose of the bypass line is to "maintain[] constant pressure in the outlet line 220."  (*Id.* at col. 10 ll. 63–65.)  The parties agree that this is accomplished, when pressure is too high in the outlet line, by selectively opening the bypass line to draw butane out of the outlet line and circulate it back to the butane tank.  (Pl.'s Responsive Claim Constr. Br. [hereinafter Sunoco Br.] [95], at 12; Venture Reply Br. 7.)



FIG 2

If the connection between the bypass line and the outlet line were always open, as Venture's proposed construction of "in fluid connection" would require, the bypass line would be unable to perform the function of selectively lowering the pressure. This use of "fluid connection" is therefore inconsistent with Venture's proposed definition of "in fluid connection" as an open connection.

Venture argues that regardless of the existence of the bypass line, butane is always consistently flowing to the blending unit during blending. (Venture Reply Br. 7.) Even if this is true, the argument is not responsive. "In fluid connection" is used to describe the *bypass* line, which by its nature does not always have butane consistently flowing through it. Venture's proposed construction does not survive that use of "in fluid connection."

### d. Disparagement of prior art

Venture also notes language in the '629 Patent that disparages prior art, and argues that a construction of the claims without the immediacy limitation would contradict that language. The '629 patent disparages blending at refineries and pipelines in the following ways: it points out that (1) "[blending at refineries] is imprecise,[] because the blended gasoline is subsequently mixed in the pipeline with other sources of gasoline of varying Reid vapor pressure" ('629 Patent col. 2 ll. 9–12), and (2) that "pipelines serve multiple regions that have variable RVP requirements . . . ." (*Id.* at col. 2 ll. 12–16.) Blending at tank farms is superior, the specification

18

notes, because tank farms "generally service a smaller area than an entire pipeline," and therefore "blending at the tank farm can be more narrowly tailored to the RVP requirements of a particular region." (*Id.* at col. 2 ll. 33–36.) The patent disparages the practice of blending an entire tank at the tank farm, however, because blending a full tank is labor intensive: the RVP must be measured in many parts of the tank to get an accurate reading, and "considerable stirring must occur to maximize homogeneity." (*Id.* at col. 2 ll. 46–50.) Worse, the RVP must be checked, and additional butane added, every time new gas is added to the tank. (*Id.* at col. 2 ll. 41–43.)

Venture argues that unless its construction is adopted, the '629 Patent claims cover a system located at a refinery, or along a pipeline, or would cover tank blending, which is the prior art that the inventors disparaged. (Venture Reply Br. 3.) The following is the first claim of the '629 patent:

> 1. A system for blending gasoline and butane comprising:
> a tank of gasoline;
> a tank of butane;
> a blending unit downstream of and **in fluid connection** with the tank of gasoline and the tank of butane; and
> a rack downstream of and in fluid connection with the blending unit, wherein the rack is adapted to dispense gasoline to a gasoline transport vehicle.

('629 Patent col. 13 ll. 12–19.) This claim mirrors the language of Claim 1 of the '302 patent, except that it omits "at the tank farm" from its introductory phrase. (*See* '302 Patent col. 13 ll.12–23.) If Sunoco's construction is adopted, therefore, the '629 claim does not plainly limit the location of any of these elements, as long as they are connected in a way that allows liquid to flow between them.

Disparagement of prior art can amount to a disclaimer of the disparaged features. *Openwave Sys., Inc. v. Apple, Inc.*, 808 F.3d 509, 517 (Fed. Cir. 2015). In *Openwave*, a patent holder sought to construe its claim for a "mobile device" to include "mobile devices containing computer modules." *Id.* at 511–12. The description of the single embodiment in the patent, however, stated that the mobile device did not "require[] a separate computer module as in the

prior art," *id.* at 513–14, and the specification consistently identified the computer module as the primary defect in the prior art because the module was too heavy, bulky, and expensive, *id.* at 514–15.  The Federal Circuit, noting "[t]here is no doubt a high bar to finding disavowal of claim scope through disparagement of the prior art in the specification," nevertheless affirmed the district court's interpretation that the claim could not be construed to include a mobile device with a computer module.  *Id.* at 517.

The patents at issue in this case do disparage the prior art of blending at refineries and pipelines.  Significantly, however, the disparagement is not aimed purely at the location itself. Instead, the patent language points out that the location makes it difficult to achieve the maximum allowable RVP at the point of distribution to tanker trucks (at the rack).  The '629 patent disparages blending at the refinery and in the pipeline by pointing out that they are imprecise and serve too large an area.  Essentially, the maximum RVP could not be achieved at each distribution point, using available technology, by blending at the earlier points in the distribution chain.

As the court reads this disparagement language, the limitation it implies is not on timing, but on the ability of the invention to achieve the desired RVP at the rack.  It may well be that, based on the technology available at the time, this disparagement (or other parts of the specification) limits the '629 and '302 patents to blending at the tank farm. [4]  (*See* '629 Patent col. 3 ll. 23–25) ("The blending occurs downstream of the gasoline and butane storage tanks on the tank farm . . . .") (summary of invention section).  But such a limitation, if it exists, is quite different than the one proposed by Venture, which would require that the blend must be dispensed to the rack without delay.  In short, the limitation proposed by Venture is not supported by the specification, as it was in *Openwave*.

_____

[4]    The '671 patent—a continuation of the '629 patent—contains an embodiment that employs a sophisticated version of this system to blend *in pipelines* by precisely adding butane to "batches" of gasoline as they flow past the blending system, at a level designed to match the maximum RVP at the location to which they are being sent. (*See* '671 Patent col. 4 ll. 40–53.)   The '671 patent is not limited by the language or the underlying logic of the disparagements in its predecessor patents.

Finally, under Sunoco's interpretation of "in fluid connection," the system described in Claim 1 of the '629 patent does not cover the tank blending process disparaged in the patents. The patent disparages tank blending when it occurs within a single tank: "When delivery of gasoline is made to a large storage tank, the RVP of the tank is measured and sufficient butane is added to the tank to attain a desired RVP." ('302 Patent col. 2 ll. 24–27.) But Claim 1 includes multiple elements that are not included in tank blending: separate tanks of gasoline and butane, connected to a blending unit such that liquid can be passed to the blending unit, which in turn must be connected to a rack such that the blend may pass to the rack. The tank blending process disparaged by the patent does not include a blending unit through which the gasoline and butane run before being dispensed. In that disparaged process, the gasoline never leaves the tank before being blended in the same tank. Therefore, the claim does not include the tank blending process disparaged by the patent even if Sunoco's interpretation is adopted.

### e. Conclusion

The parties raise several arguments related to infringement, but those arguments are not appropriate for the claim construction stage. *See Am. Piledriving Equip. v. Geoquip, Inc.*, 637 F.3d 1324, 1331 (Fed. Cir. 2011) ("It is well settled that the role of a district court in construing claims is not to redefine claim recitations or to read limitations into the claims to obviate factual questions of infringement and validity but rather to give meaning to the limitations actually contained in the claims, informed by the written description, the prosecution history if in evidence, and any relevant extrinsic evidence."). The court finds the claim language and specification do not require that a temporal immediacy limitation be imported into either term. Sunoco's definition of "in fluid connection" is supported by the specification, and the court adopts it.

Beyond the temporal immediacy requirement, the meaning of "dispensing the blend" is not apparently disputed by the parties. Venture has proposed a construction of "dispensing the

blend" that includes the term "dispensing" and only further defines "blend" as "blended gasoline." Sunoco proposes the plain meaning of the term. The court derives no real dispute from these positions and accordingly finds that "dispensing the blend" has a commonly-understood meaning that does not require construction.

### 2. Blending unit

| Claim term | Sunoco's proposal | U.S. Venture's proposal |
|---|---|---|
| "blending unit"<br><br>(claims 1, 2, 4, 5, 6, 9, 10, 17, 36, 37 of the '302 patent; claims 1, 2, 3, 10, 11 of the '629 Patent; claims 1, 16, 42, 43, 46, 47, and 52 of the '671 patent) | "a unit that can determine and control the blending of butane into gasoline" | *plain and ordinary meaning*, or alternatively, "a unit that blends" |

#### a. '302 and '629 Patents

The parties dispute the meaning of the term "blending unit" as it repeatedly appears in the claims, for example:

> 1. A system for blending gasoline and butane at a tank farm comprising:
>    a) a tank of gasoline;
>    b) a tank of butane;
>    c) a **blending unit**, at the tank farm, downstream of and in fluid connection with the tank of gasoline and the tank of butane;
>    d) a dispensing unit downstream of and in fluid connection with the **blending unit**; and
>    e) a rack, wherein the dispensing unit is located at the rack and is adapted to dispense gasoline to gasoline transport vehicles.

('302 Patent col. 13 l. 12–23.)

Sunoco contends that the blending unit referred to in the claims both determines the ratio of and controls the blending of the gasoline and butane. (Sunoco Br. 16–20.) The specification of the '302 and '629 patents, however, describes the blending unit in much simpler terms:

> The blending unit can be any conventional apparatus that achieves blending of two or more separate streams into one. For example, the unit can be a Y-type or T-type junction that consolidates two independent streams. Alternatively, the blending unit can be an injector, which selectively injects butane into a gasoline stream.
> The ratio at which the gasoline and butane streams are blended can be controlled at a variety of points along the path of travel for the gasoline and

butane, using a variety of methods. In the injection method discussed above, the ratio can be controlled simply by varying the rate at which butane is injected into a gasoline stream flowing at a substantially constant rate. Alternatively, the ratio can be controlled by varying the rate at which gasoline and/or butane is supplied to the blending unit. The rate can be controlled by adjusting valves located between the tank and the blending unit, or by varying the output of pumps that control the flow of butane and/or gasoline to the blending unit.

('302 Patent col. 5 ll. 29–46; '629 Patent col. 5 ll. 34–51.) The summary of invention similarly states that "[t]he apparatus for blending the [b]utane and gasoline is any conventional Y-type or T-type juncture capable of joining two fluid flows into one." ('302 Patent col. 3 ll. 21–23; '629 Patent col. 3 ll. 28–30.) The specification defines the term "blending unit" in broad terms, and that definition is inconsistent with the position now Sunoco advocates. The specification controls. *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) (a patentee can choose to "be his own lexicographer").

Nothing in the remainder of the specification in the '302 or '629 patents conflicts with the quoted definition of "blending unit" that the specification provides. Sunoco argues that the blending unit must be something more than "just pipe," as the paragraph immediately following the definition describes control of the quantity of the butane and gasoline entering the unit. The rest of that paragraph, however, describes those methods of control as independent of the blending unit itself: "valves located between the tank and the blending unit" ('302 Patent col. 5 ll. 43–44), and "pumps that control the flow of butane and/or gas to the blending unit." ('302 Patent col. 5 ll. 45–46). This sentence structure can only be interpreted to mean that "blending unit" does not encompass those valves or pumps.

Also contrary to Sunoco's proposal, the specification never states or implies that the blending unit is capable of performing the calculation to create a blend ratio. Where the patent references an automatically calculated blend ratio, the specification articulates that a separate process control unit is making that calculation:

- "The variable ratio blending unit is preferably under the separate control of a process control unit, which dictates and controls the ratio at which butane and

gasoline are blended based upon the prescribed vapor pressure." ('302 Patent col. 6 ll. 11–14; '629 Patent col. 6 ll. 16–19.)[5]

- "Thus, in one embodiment, the system comprises a process control unit, wherein the process control unit generates a ratio input signal that controls the ratio of butane and gasoline blended by the blending unit." ('302 Patent col. 6 ll. 22–28; '629 Patent col. 6 ll. 27–33.)

- "Thus, in still another embodiment, the invention provides a process control unit that[] comprises one or more information processing units capable of transforming measurements from the gasoline and butane vapor pressure sensors into the ratio input signal, and maintaining or varying the ratio of the gasoline and butane blended in the blending unit." ('302 Patent col. 8 ll. 7–12; '629 Patent col. 8 ll. 11–16.)

When the specification turns to discussing the schematic, it references an "analyzing and blending unit 120" which contains injectors and a processor. ('302 Patent col. 9 l. 64; '629 Patent col. 9 l. 67–col. 10 l. 1.) The analyzing and blending unit is outlined below:



---

[5] At this point in the specification, the patent begins to refer to a "variable ratio blending unit," rather than simply a "blending unit." (*See, e.g.*, '302 Patent col. 5 ll. 67.) The court notes that a "variable ratio blending unit" is a unit that has the required elements (such as valves or pumps) that can be controlled to achieve the desired gasoline/butane ratio: "In a preferred embodiment the gasoline and butane are blended by a variable ratio blending unit, in which the ratio of gasoline and butane is controlled and/or varied by any of the foregoing mechanisms." ('302 Patent col. 5 l. 66–col. 6 l. 2.) The process control unit is distinct from even this more sophisticated type of blending unit, which supports the court's conclusion that a "blending unit" does not "determine" the blend ratio.

24

While the "analyzing and blending unit 120" may well meet the definition proposed by Sunoco—that it can determine and execute a blend ratio—this does not mean that a "blending unit" can do that, and in fact encourages the opposite conclusion. Different phrases are presumed to have different meanings, *cf. Nystrom*, 424 F.3d at 1143, and if the inventors had intended "analyzing and blending unit" to have the same meaning as "blending unit," they would not have added the term "analyzing." The specification never states or implies that a blending unit alone is capable of independently determining and executing a blend ratio, and a separate process control unit is always part of the design where the system is "determin[ing] and control[ling] the blending of gasoline and butane." The schematic embodiment's description of the outlined area as an "analyzing and blending unit"—which includes a processor—is consistent with the specification's definition of the term "blending unit" as something as simple as a Y-shaped pipe junction. In short, the schematic embodiment does not alter the court's conclusion that a "blending unit," unadorned with the modifier "analyzing," does not determine and control the blend.

Finally, the claims themselves conform to this definition. Claim 2, which is dependent on Claim 1, introduces a reference to a process control unit: "The system of claim 1 further comprising a process control unit, wherein the process control unit generates a ratio input signal that controls the ratio of butane and gasoline blended by the blending unit." ('302 Patent col. 13 ll. 24–27; '629 Patent col. 13 ll. 20–23.) A limitation in a dependent claim creates a presumption that the limitation does not exist in the independent claim. *Phillips*, 415 F.3d at 1314–15. The processing unit in Claim 2 does not exist in Claim 1, and therefore, the "blending unit" referred to in Claim 1 cannot be the "analyzing and blending unit" described in the specification because the only difference between those two terms in the specification is the existence of the processor. The "blending unit" in Claim 1 is, instead, "any conventional apparatus that achieves blending of two or more separate streams into one" as expressly defined in the specification. ('302 Patent col. 5 ll. 28–29; '629 Patent col. 5 ll. 34–35.)

Sunoco resists this construction. If the blending unit is construed as simply as a pipe, Sunoco contends, then the invention is incapable of controlling the gasoline/butane blend rate, which is inconsistent with what the invention is supposed to achieve. *Cf. Alloc v. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) (court must consider whether "the very character of the invention requires the limitation be a part of every embodiment."). Sunoco notes that the specification states that existing tank farms can be adapted by simply "modifying their piping systems to integrate a blending unit between an existing gasoline tank and an existing dispensing unit." ('302 Patent col. 4 ll. 53–55.) Several of the claims containing the term, such as Claim 1 of the '302 and '629 patents excerpted above, similarly state only that a "blending unit" must exist between the tanks of butane and gasoline and the dispensing unit. Sunoco argues that "the very character of the invention," therefore, requires that the blending unit be capable of controlling the butane and gasoline put into it, otherwise the invention does nothing in its most simple embodiment.

As above, the court will read a limitation from the specification into a claim only where the specification uniformly reveals it to be a limit on every embodiment of the invention. In *Alloc*, the Federal Circuit affirmed the International Trade Commission's finding that an invention concerning joints between wooden boards was limited to joints that included "play," that is, wiggle room, between the joining elements. 342 F.3d at 1368–70. The court framed the question as "whether the specification refers to a limitation only as a part of less than all possible embodiments or whether the specification read as a whole suggests that the very character of the invention requires the limitation be a part of every embodiment." *Id.* at 1370. The specification of the patent in question, in broadly describing the invention in the summary section, expressly discussed play between the locking elements, considered the advantages of play, disparaged systems without play, and, in every embodiment, implied play or expressly disclosed it. *Id.* at 1368–70.

The character of the invention at issue in this case does not require that the blending unit itself be capable of being controlled by mechanisms within the unit, as Sunoco argues. To the contrary, the specification refers to control of the blending unit with mechanisms that are not part of the blending unit and that could already exist at the tank farm or could be part of "modifying [the tank farm] piping systems" to incorporate the invention. (*See* '302 Patent col. 5 ll. 42–45 ("The rate can be controlled by adjusting valves located between the tank and the blending unit, or by varying the output of pumps that control the flow of butane and/or gasoline to the blending unit.").) The portion of the specification discussing integration of the system further notes that "because most tank farms do not already contain a butane tank, one or more such tanks will need to be added." (*Id.* at col. 4 ll. 55–57.) As the specification contemplates, a pump associated with an additional butane tank would not be part of the blending unit, but would be able to control the amount of butane going into the blending unit. (*Id.* at col. 5 ll. 42–44 ("The rate can be controlled . . . by varying the output of pumps that control the flow of butane . . . .").) Therefore, construing the blending unit as a simple junction in pipe does not deprive the invention of its essential character.

Sunoco similarly argues that the blending unit itself must be able to control the blend, but the court concludes that the controller also does not need to be a part of the blending unit in order for the system of Claim 1 to function as intended. Many parts of the specification and the claims themselves appear to contemplate the patented system operating without a processing unit; Sunoco urges that this must mean that the blending unit is doing the controlling. The alternative, however, is not a self-regulating blending unit that contradicts the express definition in the specification, but a human operator. Though this would not be the ideal version of the invention, it would be a functional version of Claim 1 that is consistent with the specification. Unlike *Alloc*, the character of the invention can still be achieved if the method of calculating the blend ratio and controlling the blending unit are separate from the blending unit. Therefore, the court declines to adopt the proposal that the blending unit must determine and control blending.

The court is unwilling to adopt Sunoco's proposed claim construction of the term "blending unit," but also disagrees with Venture's suggestion that the term does not require construction at all. Venture's alternative proposal—"a unit that blends"—is unhelpful, as it provides no more information than the term "blending unit." The court therefore suggests that the definition in the specification, "any conventional apparatus that achieves blending of two or more separate streams into one" ('302 Patent col. 5 ll. 28–29; '629 Patent col. 5 ll. 34–35), be adopted for the meaning of "blending unit" in the '302 and '629 patents. Because this definition was not suggested by either party, the court invites additional briefing if either party has objections on a basis not already addressed in this opinion.

### b. The '671 Patent

The '671 patent uses "blending unit" differently than its predecessors, suggesting a different construction is necessary for that patent. There, rather than defining the blending unit as any apparatus capable of blending two streams, the specification states:

> Significantly, the blending unit described in any of the foregoing embodiments may comprise two valves . . . . One valve is an on/off valve located between the gasoline stream and the butane stream. This valve can prevent gasoline from entering the blending unit. The second valve is a modulating valve that controls the flow of butane towards the first valve. The second valve controls the rate of flow of butane by modulating both the pressure of the butane stream passing through the valve as well as the size of the orifice through which the butane stream flows. The modulating valve and/or the on/off valve may be under the control of a process control unit . . . . The valves may also be under the control of one or more remote information processing units.

('671 Patent col. 9 ll. 29–50.) The specification, in every embodiment of the invention, uniformly assumes that the blending unit is (1) capable of receiving digital communications from an information processing unit (IPU) that is transmitting the desired blend ratio and (2) able to execute that blend ratio. For example:

- "Therefore, in one embodiment . . . wherein said blending unit periodically receives said calculated blend ratio from said IPU, and adjusts the actual blend ratio to coincide with said calculated blend ratio." ('671 Patent col. 3 ll. 24–41.)

- "In one embodiment . . . wherein said blending unit periodically receives said calculated blend ratio and calculated blend rate from said one or more IPUs, and adjusts the actual

28

blend ratio and actual blend rate to coincide with said calculated blend ratio and calculated blend rate." (*Id.* at col. 3 l. 42–col. 4 l. 13.)

This language, requiring that the blending unit have both the ability to receive digital communications and execute a blend ratio, is repeated substantially verbatim throughout the '671 specification. (*See, e.g., id.* at col. 7 ll. 35–52; *id.* at col. 7 l. 67–col. 8 l. 4; *id.* at col. 8 ll. 29–52.) Because the term "blending unit" is defined differently and the term is consistently used throughout the patent to have these capabilities, it has a different definition than "blending unit" in the '302 and '629 patents. The court proposes the specification's definition of "a unit capable of receiving a calculated blend ratio from an information processing unit, and adjusting the actual blend ratio or actual blend rate to achieve the calculated blend ratio." (*See* '671 Patent col. 3 ll. 38–41.) Because this definition was not proposed by either party, the court invites further briefing if the parties have objections on bases not already addressed by this opinion.

### 3. A vapor pressure

| Claim term | Sunoco's proposal | U.S. Venture's proposal |
| --- | --- | --- |
| "a vapor pressure of the gasoline stream" <br><br> (claims 14 and 41 of the '302 patent; claims 7, 8, 15, 17, 24 and 31 of the '629 patent) | plain and ordinary meaning | "vapor pressure determined by a measurement taken from the gasoline stream" |
| "a vapor pressure of the butane stream" <br><br> (claims 14 and 41 of the '302 patent; claims 7, 8, 17 of the '629 patent) | plain and ordinary meaning | "vapor pressure determined by a measurement taken from the butane stream" |
| "a butane stream that comprises <u>a butane vapor pressure</u>"* <br><br> (claims 1, 26, 34, 42, and 53 of the '671 patent) <br><br> *The parties have requested construction of only the underlined portion; the remainder is provided for context.* | plain and ordinary meaning | "vapor pressure determined by a measurement taken from the butane stream" |
| "a vapor pressure of the volatility modifying agent stream" <br><br> (claim 15 and 24 of the '629 patent) | plain and ordinary meaning | "vapor pressure determined by a measurement taken from the volatility modifying stream" |

29

For each of these vapor pressure terms, Sunoco believes that no construction is necessary, and that the plain meaning controls. Venture sees this differently. Venture's proposed construction seeks to define the location from which the vapor pressure measurement referenced in the claims is taken. As used in the claims, the phrase refers only to a property of the stream, for instance:

> 14.    The method of claim 13, wherein the blend ratio is determined from **a vapor pressure of the gasoline stream** and **a vapor pressure of the butane stream**.

('302 Patent col. 14 l. 17–19.) With respect to this term, again, Venture contends that a limitation should be imported from the rest of the specification, because the specification disparages the prior art practice of deriving the measurement of a stream from earlier in the process than the stream itself. Venture notes, for instance, the following language from the specification:

> Samples of the gasoline and butane can be drawn from the system at any point upstream of the point where butane and gasoline are physically mixed. However, the samples are preferably drawn from the butane and/or gasoline stream after such butane and/or gasoline has been drawn from the storage tanks, because of the lack of product uniformity within these large tanks.

('302 Patent col. 7 ll. 31–37.) Venture urges the court to adopt the second sentence as a limitation on the location at which vapor pressure measurements can be drawn; specifically, Venture contends, the vapor pressure must be determined after the streams have left the tanks. (Venture Br. 21.) But this proposal ignores the first sentence of the paragraph, which states explicitly that "[s]amples of gasoline and butane can be drawn from the system **at any point upstream**." ('302 Patent col. 7 ll. 31–33 (emphasis added).) The only limitation imposed here is a preference that the samples be drawn from the streams themselves. The second sentence cannot become a limitation on the claim without rendering the first meaningless.

Venture also cites the following statement from the specification in support of its argument that the vapor pressure measurement cannot come from the tank:

As mentioned above, the vapor pressure of gasoline within a large tank can vary considerably over time. It is therefore necessary to monitor the vapor pressure of the gasoline and butane streams with some degree of frequency.

('302 Patent col. 7 ll. 57–60.) This excerpt does not conflict with the specification's general statement that the "[s]amples of the gasoline and butane can be drawn from the system at any point upstream . . . ." (*id.* at col. 7 ll. 31–33), because, like the claims, it does not say where the measurement of the streams is taken. Venture is correct that the specification generally disparages taking measurements from locations other than the streams themselves. But the specification does not impose a uniform limitation against measuring vapor pressure anywhere upstream of the gasoline and butane stream, *cf. C.R. Bard*, 388 F.3d at 866 ("plug" that was unfailingly referred to in specification as having pleats was limited to a plug having pleats), particularly where the most general statement from the specification on the issue flatly contradicts that proposal.

Apart from the location of measurement, the parties do not appear to dispute the meaning of "a vapor pressure" as a property of the stream. The court agrees with Sunoco that the term does not obviously require construction beyond its ordinary meaning to persons skilled in the art. Accordingly, the court accepts Sunoco's proposed construction as the plain and ordinary meaning of the term.

### 4. Operable

| Claim term | Sunoco's proposal | U.S. Venture's proposal |
|---|---|---|
| "operable"<br><br>(claim 4 of the '302 patent; claims 3 and 4 of the '629 patent) | plain and ordinary meaning, or alternatively, "capable of performing the recited function" | "capable of performing the recited function without the need for modifications in the structure or the source code for the system" |

The parties dispute the meaning of the word operable as it appears in the claims, for instance:

4.  The system of claim 2, further comprising:
    a)  a gasoline vapor pressure sensor **operable** for measuring the vapor pressure of gasoline upstream of the blending unit;
    b)  a butane vapor pressure sensor **operable** for measuring the vapor pressure of butane upstream of the blending unit;

c)      wherein the ratio input signal is generated from the vapor
pressures of gasoline and butane measured by the gasoline
vapor pressure sensor and the butane vapor pressure sensor.

('302 Patent col. 13 ll. 31–41.)  Venture proposes a definition that would exclude a system that requires modifications of any kind to perform the function, whereas Sunoco proposes that "operable" requires no construction, or should be construed to mean "capable of," which would encompass a product that was modified to perform the task.

Venture's proposal effectively seeks resolution of an infringement issue—whether an accused device is "reasonably capable of satisfying the claim limitation," *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1262 (Fed. Cir. 2013) (quoting *Finjan v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010))—at the claim construction stage.  Venture supplies no support for its construction of "operable" other than this argument on the law of infringement.  The court is unwilling to define a term in a way that begs the question of the law of infringement with no other support from the claim or the specification.

"Operable" has an ordinary meaning readily ascertainable by the jury, and does not need to be construed.  Sunoco cites a number of cases where "operable" is defined in accord with its usual definition.  The Federal Circuit in *Alticor Inc. v. Ultra-Sun Technologies, Inc.* construed a claim for a water purification system that made use of ultraviolet light, which contained a "radiant energy monitor operable for monitoring the performance of said source of radiant energy."  106 Fed. App'x 46, 47–48 (Fed. Cir. 2004).  The court affirmed the district court's interpretation that the monitor was "fit for or capable of" two tasks: monitoring the performance of the energy source and providing an indication when the source had reached the end of its useful life.  *Id.* at 50.  The meaning of "operable" was not primarily at issue, as the dispute centered around the particular functions of the device.  *See id.*  Nevertheless, the opinion indicates that the court considered "operable" and "fit for or capable of" interchangeable.  *See also Edberg v. CPI-The Alternative Supplier, Inc.*, 41 Fed. App'x 426, 427, 432 (Fed. Cir. 2002) (construing term "medium . . . operable to allow . . . log phase reproduction of said target

32

microbe" to mean "capable of supporting log-phase growth of only the target microbes" without dispute on the meaning of "operable.").

Courts of this district have interpreted "operable" either to bear its ordinary meaning or to mean "capable." In *Tellabs Operations, Inc. v. Fujitsu Ltd.*, the court construed the term "is operable to communicate a wavelength," in a patent concerning an optical communication system, as "*can* send a wavelength." No. 08 C 3379, 2009 WL 1329153 at *13–14 (N.D. Ill. May 13, 2009) (emphasis added). In *Bergstrom, Inc. v. Glacier Bay, Inc.*, the court affirmed a Special Master's construction of the term "a vehicle air conditioning system operable to provide engine on and off operation" to mean "a vehicle air conditioning system *capable of* providing air conditioning when the vehicle engine is on and off." No. 08 C 50078, 2012 WL 787240, at *5 (N.D. Ill. Mar. 9, 2012) (emphasis added).

Dictionaries confirm that these interpretations are consonant with the "widely accepted meaning" of this commonly-used word. *Cf. Phillips*, 415 F.3d at 1314. For instance, Merriam Webster Collegiate Dictionary defines operable as "fit, possible or desirable to be used." *Operable*, MERRIAM-WEBSTER COLLEGIATE DICTIONARY (11th ed. 2003). The Oxford New American Dictionary defines operable simply as "able to be used." *Operable*, OXFORD NEW AM. DICTIONARY 1229 (3d ed. 2010).

Accordingly, the court declines to construe operable because it has a commonly understood meaning. If the court were to adopt a construction of the term, it would adopt Sunoco's proposed construction of "capable of performing the recited function."

### 5. Upstream and downstream

| Claim term | Sunoco's proposal | Venture's proposal |
|---|---|---|
| "upstream"<br><br>(claim 4 of the '302 patent; claims 3 of the '629 patent; claims 16, 42, and 47 of the '671 patent) | plain and ordinary meaning, or alternatively, "located before, as it relates to the direction of fluid flow" | "when fluid flows from point A to point B, point A is upstream of point B" |
| "downstream"<br><br>(claims 1 and 36 of the '302 | plain and ordinary meaning, or alternatively, "located after, as it relates | "when fluid flows from point A to point B, point B is downstream of point A" |

| patent; claims 1 and 10 of the '629 patent; claims 16, 43 and 44 of the '671 patent) | to the direction of fluid flow" | |
| --- | --- | --- |

The parties raise a minor disagreement about the meaning of upstream and downstream as it is used in claims like the following:

> 4.  The system of claim 2, further comprising:
>     a)  a gasoline vapor pressure sensor operable for measuring the vapor pressure of gasoline **upstream** of the blending unit;
>     b)  a butane vapor pressure sensor operable for measuring the vapor pressure of butane **upstream** of the blending unit;
>     c)  wherein the ratio input signal is generated from the vapor pressures of gasoline and butane measured by the gasoline vapor pressure sensor and the butane vapor pressure sensor.

('302 Patent col. 13 ll. 31–41.)

> 1.  A system for blending gasoline and butane comprising:
>     a tank of gasoline;
>     a tank of butane;
>     a blending unit downstream of and in fluid connection with the tank of gasoline and the tank of butane; and
>     a rack downstream of and in fluid connection with the blending unit, wherein the rack is adapted to dispense gasoline to a gasoline transport vehicle.

('629 Patent col. 13 ll. 12–19.)

The parties propose closely similar definitions. The court notes, however, that both constructions are defined solely in terms of liquid. The court is concerned that the reference to a point in Venture's proposal obscures the fact that "upstream" and "downstream" refer to an entire section of a process. Sunoco's proposal may be read as introducing a temporal element, rather than simply referring to the order of process.

Upstream and downstream are commonly used to reference not only the flow of liquid but a process generally. For instance, the McGraw-Hill Dictionary of Scientific and Technical Terms defines "downstream" as the "[p]ortion of a product stream that has already passed through the system; that portion located after a specific process unit." *Downstream*, MCGRAW-HILL DICTIONARY OF SCIENTIFIC & TECHNICAL TERMS 647 (6th ed. 2003). Therefore, the court suggests the following definitions of upstream and downstream:

*upstream*: the portion of a process that precedes the referenced unit or system in the order of that process.

*downstream*: the portion of a process that succeeds the referenced unit or system in the order of that process.

Because neither construction was suggested by the parties, the court invites additional briefing if either party objects on grounds not already addressed by this opinion.

### 6. Agreed terms

The parties agree to the following construction of "gasoline" and "tank farm," and the court accordingly adopts those constructions:

| Claim term | Agreed construction |
|---|---|
| "gasoline"<br><br>*in passim* | Various types of refined petroleum that are used as fuel |
| "tank farm"<br><br>'302 Patent, claims 1, 12, 18, 36, 39 | Any facility that contains a number of large storage tanks for petroleum products received from a refinery and distributed to tanker trucks |

## CONCLUSION

The claim terms in the '302 Patent, '629 Patent and '671 Patent are construed as follows:

| Claim term | Construction |
|---|---|
| "in fluid connection" | the elements are arranged such that fluid can flow from one element to another element |
| "dispensing the blend" | plain and ordinary meaning |
| "blending unit" | '302 and '629 Patents: any conventional apparatus that achieves blending of two or more separate streams into one<br>'671 Patent: a unit capable of receiving a calculated blend ratio from an information processing unit, and adjusting the actual blend ratio or actual blend rate to achieve the calculated blend ratio |
| "a vapor pressure" | plain and ordinary meaning |
| "operable" | plain and ordinary meaning |
| "upstream" | the portion of a process that precedes the referenced unit or system in the order of that process |

| "downstream" | the portion of a process that succeeds the referenced unit or system in the order of that process |
|---|---|
| "gasoline" | various types of refined petroleum that are used as fuel |
| "tank farm" | any facility that contains a number of large storage tanks for petroleum products received from a refinery and distributed to tanker trucks |

ENTER:

Dated:  April 28, 2017

_____

REBECCA R. PALLMEYER
United States District Judge